Filed 7/15/16

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C070517 |
| Plaintiff and Respondent, | (Super. Ct. No. SF113430A) |
| v. | |
| EUGENE SCOTT SNYDER, | |
| Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of San Joaquin County, Bobby W. McNatt, Judge.  Affirmed in part and reversed in part.

        Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Sean M. McCoy and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

---

*  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part I.

Defendant Eugene Scott Snyder appeals from a judgment convicting him of nine counts of child molestation and one count of possessing child pornography. He contends (1) insufficient evidence supports one count of committing lewd acts upon a child under the age of 14 and (2) the trial court abused its discretion under Evidence Code section 352 by admitting into evidence nearly 100 images of child pornography confiscated from defendant's residence. We agree with defendant's first contention but disagree with his second. We affirm the judgment except to reverse it as to one count of molestation.

FACTS

*Victim L.T.*

L.T. was born in December 1985. She testified at defendant's 2011 trial at the age of 25. Her grandmother raised her.

L.T. met defendant at a Native American pow-wow she and her grandmother attended in the summer before she started 8th Grade. She was 13 years old. Defendant was 36 years old.[1] L.T.'s grandmother's car broke down, and defendant agreed to take them home. Defendant and L.T. flirted on the way home.

Defendant began seeing L.T. at her home on a regular basis and became a family friend. When L.T.'s grandmother was there, he treated L.T. like a normal kid, but when she was not there, he treated L.T. as a girlfriend. They held hands and kissed.

They soon began having sex. They had sexual encounters "so many times." We describe the evidence supporting each of the eight counts concerning L.T. as specifically alleged in the information.

---

[1]     Defendant's probation report lists his birthday as August 3, 1963.

*Count 1:  Summer 1999, " 'First Time Sexual Intercourse,' " Penal Code section 288, subdivision (a)*[2]

During the summer while she was still 13 years old, L.T. invited defendant into her bedroom.  She told him she wanted to have sex.  It was their first time.  They had intercourse on the bed.  When the intercourse became painful, L.T. asked defendant to stop, and he did.

*Count 2:  Summer 1999 – December 4, 1999, " 'Kissing,' " section 288, subdivision (a)*

During that summer and up until L.T.'s 14th birthday, defendant and L.T. kissed frequently and intimately.

*Count 3:  Summer 1999 – December 4, 1999, " 'Intercourse Between 1st Time & While Menstr[u]ating,' " section 288, subdivision (a)*

While still 13 years old, L.T. skipped school and spent the day with defendant in a motel room.  They had intercourse multiple times.  Defendant audiotaped them having sex and photographed her orally copulating him.  L.T. often skipped school in order to be with defendant.

*Counts 4 and 5:  October 1999 – December 4, 1999, " 'Sexual Intercourse While Menstruating,' " sections 269, 288, subdivision (a)*

Many times, defendant and L.T. would have sex in his truck while parked in a church parking lot.  Defendant had a mattress in his truck bed, and a camper shell covered the bed.  Defendant would pick L.T. up around 7:00 a.m., and they would have sex before she went to school.

One time in the fall or winter of 1999, when they were having sex in the truck at the church parking lot, L.T. asked defendant to stop.  She had been menstruating at the

---

**2**     Undesignated section references are to the Penal Code.

time.  She told defendant she did not want to continue and to get off her, but he continued to orgasm.  L.T. began crying; he apologized and drove her to school.  L.T. said this incident happened when she was 13 years old, but she could not remember the time of year.

*Count 6:  Summer 1999 – December 4, 1999, " 'Finger in Vagina,' " section 288, subdivision (a)*

During the summer of 1999, defendant digitally penetrated L.T. while they sat in his truck at Angel Cruz Park.  L.T. knew this act happened when she was 13; the penetration hurt her because she and defendant had not had much sexual contact prior to this incident.

*Count 7:  Summer 1999 – December 4, 1999, " 'Sexual Intercourse @ Grandma's House After 1st Time,' " section 288, subdivision (a)*

L.T. testified she was 13 years old the second time she and defendant had sex, but she could not remember where the second time occurred.  They had sex in many places, including "in my house."  L.T. said it was nighttime the second time she and defendant had sex at her grandmother's house, but she could not recall the exact month when it occurred.

*Count 8:  December 5, 1999 – December 4, 2000, " 'Sexual Intercourse While 14 Years Old,' " section 288, subdivision (c)(1)*

When L.T. was 13 or 14 years old, defendant obtained permission from L.T.'s grandmother to take her to the movies.  Instead, he took her to his house, and they had sex there.  L.T. stated the two had sex at defendant's home "[m]any times."  She also had sex with him at her grandmother's house when she was 14 "[m]any times."

Once, when L.T. was 14, defendant drove her and her grandmother to visit the family of a man her grandmother was dating.  While there, defendant and L.T. had sex in the back of defendant's truck and in the house of one of the relatives.  They also had sex on the drive home.

4

L.T. stopped seeing defendant before her freshman year in high school when she was 15 years old. In 2000, detectives questioned her about defendant. She had been scared and denied anything inappropriate had happened between them. In 2001, she lied in court under oath, claiming she had no sexual contact with defendant.

In 2009, defendant contacted L.T. through MySpace. She responded by confronting him about sexually abusing her when she was a young girl. Defendant responded: "I'm so sorry for hurting you. I just don't know what I was thinking of. I never meant to hurt you in any way. Please forgive me. I'll leave you alone again. I'm so sorry."

Later that year, L.T. met with police and informed them of her past relationship with defendant. The police arranged for L.T. to make a pretext call to defendant. The audiotape of the call was played to the jury. During the call, defendant said he wanted "to say how sorry I am. I know I should of stopped you that first night that you kissed me . . . and that night that you took me by the hand and took me into the bedroom . . . . I should of stopped you. And I asked you. But I couldn't help myself. And I did fall in love and I know I shouldn't have."

Defendant stated he remembered the first night they had sex, and he again described how L.T. led him into the bedroom. He also remembered the next day, "when I took you to the motel . . . I knew I was in love. I didn't mean to hurt you." He remembered taking "naked" and "graphic" pictures at the motel, but he had gotten rid of them. When asked why he took the pictures, defendant said he did not know why. He did not look at L.T. as a little girl, but as a woman and his girlfriend. He fell in love with her.

L.T. asked him how many times he thought they had sex. He said he did not know, but "it was quite a bit I know that." He remembered picking L.T. up at her grandmother's house, taking her behind the church, and having sex with her there.

L.T. asked defendant if he felt he had taken advantage of her. Defendant thought he probably had, but "[l]ike I said you know I was I was in love with you. And and at that I don't know even now I you know have always think about you on your birthday and how much I miss you just being my friend." (*Sic.*)

Defendant concluded the conversation by saying: "I never meant to hurt you. Please understand that. And find it someway in in your heart to understand how I feel. But I didn't mean to hurt you." (*Sic.*)

A week later, L.T. set up a fake meeting with defendant at a coffee shop. Police saw defendant leave his house near the appointed time and drive to the coffee shop's parking lot, where he was arrested.

*Victim V.G.*

V.G. was born in January 1994. When she was five or six years old, her mother started dating defendant, who was roughly 36 years old, and eventually they moved in with him. Defendant was a "father figure" to her, and she called him "Bear." V.G. slept between her mother and defendant in the same bed.

Three counts in the information alleged defendant molested V.G. We describe the evidence supporting each of the three counts concerning V.G. as specifically alleged in the information.

*Count 9: January 15, 2001 – January 14, 2003, " 'First Time Touching Vagina,' " section 288, subdivision (a)*

When she was around seven years old, V.G. was sleeping in bed between her mother and defendant. She awoke to defendant digitally penetrating her underneath her pajama bottoms and underwear. After this incident, V.G.'s mother slept in the middle of the bed.

6

*Count 10: January 15, 2001 – January 14, 2003, " 'Second Time Touching Vagina,' " section 288, subdivision (a)*

When V.G. was seven or eight years old, a similar incident occurred. V.G.'s mother got out of the bed to use the bathroom, and when she returned, she pushed V.G. next to defendant. V.G. awoke to defendant touching her vagina. She got up, went to the restroom, and upon returning, moved her mother into the middle.

*Count 11: January 15, 2001 – January 15, 2004, Child Molesting With a Prior, section 647.6*

When V.G. was seven or eight years old, defendant started acting like a boyfriend to her. His kisses changed from a regular, quick kiss on the lips to longer kisses. He told her that she was becoming a "big girl now." She "started feeling awkward" around defendant.

*Child pornography*

*Count 12: November 2009, Possession of Child Pornography, section 311.11, subdivision (a)*

Executing a search warrant at defendant's residence, police found a manila envelope on the nightstand next to the bed. Inside, they found photographs and sheets of photographs depicting young girls in sexual poses, in various stages of undress, and engaging in sexual acts with men.

Police seized a laptop computer and a desktop computer from the home. Both computers stored child pornography. Other pornographic images had been altered to include the faces of V.G. and defendant on the photographed adult bodies. Some of the photos found in the manila envelope were also found on the desktop computer.

*Defendant's prior incidents*

The prosecution introduced evidence of two prior incidents by defendant. The first involved defendant's niece, "A." A. was born in April 1984. She was 27 years old

when she testified at trial in 2011. A. and her older sister lived with defendant and his wife when A. was around seven or eight years old. Defendant was roughly 28 years old. At first, defendant was like a father figure to A., but later he started to kiss her on the lips in a way that was "weird" and gave her a "gross feeling." Defendant had sexual intercourse with A. on one occasion. That day, A. pretended to be sick so she could miss school. Defendant took her into his bedroom, and he told her to disrobe and get on his bed. Defendant removed his clothes and got on top of A. He kissed her and told her, "It's okay. It's not gonna hurt. I'm gonna put it in slow." A. cried while defendant had sexual intercourse with her. Afterward, defendant told her not to tell anyone.

"S." was born in March 1986. She attended her freshman year of high school at the school where defendant worked as a janitor. S.'s friends gave her balloons for her 15th birthday in March 2001. Either on that day or the day after, defendant, then 37 years old, gave S. a gift and a letter. The letter expressed how defendant wanted someone to love and to love him. It was signed, "Always and forever, Eugene." S. gave the gift and the letter to her coach. She had no further contact with defendant.

## CASE HISTORY

A jury convicted defendant of seven counts of child molestation under section 288, subdivision (a): five counts against L.T. (counts 1, 2, 3, 6, 7), and two counts against V.G. Doe (counts 9, 10). The jury also convicted defendant of one count of child molestation against L.T. under section 288, subdivision (c)(1) (count 8); one count of child molestation with a prior against V.G. under section 647.6 (count 11); and one count of possessing child pornography under section 311.11, subdivision (a) (count 12), a misdemeanor.

The jury found true enhancements under former section 667.61, subdivision (e)(5)[3] (indeterminate sentence for child sex offense against more than one victim), as to each of the seven counts under section 288, subdivision (a) (counts 1, 2, 3, 6, 7, 9, 10).

The jury was unable to reach verdicts on counts 4 and 5, and the trial court granted the prosecution's motion to dismiss those counts.

The court sentenced defendant to a total state prison term of 105 years to life, calculated as follows:  seven consecutive terms of 15 years to life on each of the seven counts under section 288, subdivision (a), and former section 667.61, subdivision (e)(5) (counts 1, 2, 3, 6, 7, 9, 10), and concurrent terms of eight months each (one-third the midterm) on counts 8 (§ 288, subd. (c)(1)) and 11 (§ 647.6), and one year on count 12 (§ 311.11, subd. (a)).

## DISCUSSION

### I

### *Sufficiency of the Evidence Supporting Count 7*

Count 7 charged defendant with committing a lewd act upon a child under the age of 14.  (§ 288, subd. (a).)  Defendant contends insufficient evidence established L.T. was 13 years old at the time the act alleged in count 7 was committed.  We agree.

"On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  ' "[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.)  "Substantial evidence includes

---

**3**    In 2010, the Legislature redesignated former subdivision (e)(5) of section 667.61 as subdivision (e)(4) of the same section.  (Stats. 2010, ch. 219, § 16.)

circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.)

"Under the provisions of section 288 of the Penal Code it is essential that the subject of the attack must be a child under the age of fourteen years, and proof of that fact must be made." (*People v. Levoy* (1920) 49 Cal.App. 770, 771; § 288, subd. (a).) The record, however, discloses no evidence that established L.T. was 13 years old the second time she and defendant had sex at her grandmother's house.

When asked to recall the second time she and defendant had any sexual contact, L.T. stated she did not remember the exact "next time" and could not say when it happened. She remembered she was 13 years old at the time of the second incident, but she did not remember where that incident occurred. When specifically asked, she stated, "There was so many times. I know there was a time in a hotel room. I know there was times at his house. I know there was times around the corner from my house where he'd pick me up in his car. I know there was times on trips that we'd taken inside the car, inside someone else's house, in my house, everywhere."

The prosecutor asked L.T. how many times she and defendant had sex at L.T.'s grandmother's home when L.T. was *14* years old. She said many times. The prosecutor, however, did not ask the same question for the period of time when L.T. was 13 years old. He asked L.T. about the first time she and defendant had sex when she was 14 years old. She could not remember, but she did say there were times she and defendant had sex *that* year at her grandmother's house.

On cross-examination, defense counsel specifically asked L.T. if she could remember the second time she and defendant had sex at her grandmother's house. All she could remember is that it was nighttime when it happened. She could not remember what season it was, or whether it was in November or October (when she was 13 years old), or December, January, or February (when she was 14 years old). On this showing,

10

the evidence does not support the jury's finding that the second time L.T. and defendant had sex at her grandmother's home happened when she was 13 years old.

The Attorney General contends we need not look for such specific evidence. She relies for her proposition on *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), which held that a child victim's testimony of molestations need not describe the details regarding the time, place, or circumstances of the molestations so long as the child describes the kind and number of acts committed with sufficient certainty, and the general time period when the acts occurred. (*Id*. at p. 316.)

Even though it was a prosecution under section 288, subdivision (a), *Jones* does not apply here because the victim's age was not an issue in that case. The testifying victim in *Jones* was under the age of 14 when he was abused *and* when he testified at trial. (*Jones, supra,* 51 Cal.3d at pp. 301, 302.) Although the *Jones* court reached its conclusion because "the particular details surrounding a child molestation charge *are not elements of the offense* and are unnecessary to sustain a conviction" (*id*, at p. 315, italics added), nowhere did *Jones* state age was not an element of the offense under section 288, subdivision (a). Instead, it stated the victim had to be able to describe "the general time period in which these acts occurred . . . to assure the acts were committed within the applicable limitation period." (*Id*. at p. 316, italics omitted.) Under section 288, subdivision (a), the limitation period for purposes of *Jones* would include proof the molestation occurred when the victim was under 14 years of age.

In this case, the prosecutor placed the victim's age at issue by specifically charging defendant with molesting L.T. a second time at her grandmother's house while she was still 13 years old in violation of section 288, subdivision (a). The prosecution thus bore the burden of introducing sufficient facts to establish L.T. was in fact 13 years old when defendant molested her a second time at her grandmother's house. The prosecution failed to meet this burden.

11

## II

### *Admission of Numerous Child Pornography Images*

Defendant contends the trial court abused its discretion under Evidence Code section 352 by admitting into evidence approximately 100 images that police had found in defendant's residence. Many were images of child pornography. Defendant claims only a few images were necessary to support the charge of possessing child pornography, and only a few other images were necessary to support his convictions of molesting V.G. He asserts admission of so many photos was unduly prejudicial. We disagree.

### A. *Additional background information*

During motions in limine, the prosecutor informed the court he had narrowed the number of images obtained from defendant's residence that depicted child pornography and adult pornography from about 18,000 images down to 100 of the most pertinent and probative images.

Defense counsel asked the court to limit the number of images that could be introduced to 50 or 60, because at some point, he argued, "it just becomes cumulative and repetitive" and "oversaturation." He suggested all the prosecution needed was a police officer to testify how many pictures he saw, and to identify "one, two, maybe 20, maybe 30, maybe 40" as representing what he saw. Counsel argued 100 pictures were "overkill" and "unfairly prejudicial."

The prosecutor stated he intended to introduce 103 pictures. Some of them were " 'generic child pornography' " depicting an unknown child naked or involved in sexual acts. Another group of images was of adult and child pornography, but photos of V.G.'s face had been superimposed on one of the participants in the images. Some of these also had defendant's picture superimposed on one of the participants in the images. The prosecutor argued that all of these images, were relevant to prove possession of child

pornography, and were relevant to show defendant's obsession with V.G. and with children, to show his motive, and to support V.G.'s testimony.

Defense counsel clarified he was challenging only the admission of 100 images of generic child pornography. The court responded: "I think we've reached a 352 point long before that, but I'm hesitant to try and draw any preconceived lines since I don't know what these pictures look like, and I don't wanna know what they look like until they come into evidence to tell you the truth, but – until they're offering them. But I don't think I can draw any lines here and say it's gonna be this number or this number. [¶] . . . [¶] Clearly, if it has some evidentiary value, then it's gonna come in unless it's unduly, and that's the operative work 'unduly,' prejudicial." The court reserved the matter for later resolution.

Testifying for the prosecution, Stockton Police Detective Jim Knief identified a manila envelope (exhibit 2) he found on defendant's nightstand. He also identified images of child pornography (exhibits 3-7) he found inside the envelope. The prosecutor asked to move the images into evidence. Defense counsel stated: "Submitted pursuant to the objections that I previously noted prior to trial." The court admitted the manila envelope and the images in exhibits 3, 4, 6, and 7.

Detective Knief then identified other photos and photo sheets (exhibits 8-17) he found in the manila envelope. These, too, were admitted into evidence, "[s]ubject to the [court's] previous rulings . . . ." The detective did not describe these images, but according to the Attorney General, exhibits 10 and 12 through 14 were nonpornographic images of V.G. Exhibits 15 and 17 depicted defendant kissing V.G. on her lips. Exhibit 16 was a photo of defendant and V.G. apparently slow dancing.

Detective Heidi Heim identified numerous images found on defendant's desktop and laptop computers, many of which were pornographic. Defense counsel objected to the images based on authentication and foundation. The court treated his objection as a continuing objection to all of the images based on authentication and foundation, and it

13

overruled the objection. Detective Heim identified, and the court published, exhibits 18 through 58 and 60 through 103. Most of these images were pornography or child pornography.

After the prosecution closed its case, the prosecutor moved to have the exhibits admitted into evidence. As to the exhibits found in the manila envelope (exhibits 2-17), defense counsel objected to admitting exhibits 8 and 12 through 17 on the basis of lack of foundation and relevance. The trial court overruled the objection.

When the prosecutor moved to admit exhibits 18 through 58, images found primarily on defendant's desktop computer, defense counsel objected under Evidence Code section 352. Counsel stated, "I understand [t]he Court's ruling related to my in limine motions at the very beginning and [t]he Court limiting the number of pictures. I would continue to raise my objection and indicate that I believe that the number should be less considering the gravity and the severity of the nature of the pictures. So pursuant to 352, I would raise an objection as to entering these into evidence." The trial court overruled the objection, stating, "[M]y ruling will be the same."

Defense counsel also objected when the prosecutor sought to admit exhibits 60 through 103 into evidence, images taken primarily from defendant's laptop computer. Counsel objected under Evidence Code section 352 based on "the graphic nature of the pictures." The trial court overruled the objection.

According to the Attorney General and appellate counsel, nine of the images taken from defendant's computers were nonpornographic images of V.G. (exhibits 34-35, 37-38, 62, 66, 69, 74, 91). Defendant admits these images were relevant.

Many of the remaining images were pornographic. According to the parties, a number of the images were of "generic" child pornography not depicting V.G. or defendant. Nineteen exhibits depict nude or partially nude young girls, some exposing their genitals (exhibits 19-20, 22, 25-26, 28, 36, 39, 44, 46, 49-53, 55-57, 64); three exhibits depict young girls exposing their genitals or engaging in sexual acts (exhibits 7,

14

47, 48); and 16 exhibits depict young girls engaged in sex acts with men, including oral copulation and intercourse (exhibits 5-6, 23-24, 29-30, 40-43, 54, 63, 65, 67, 70, 71).

Another group of exhibits contained pornographic images with photographs of V.G., defendant, or both superimposed on the faces of the original models. Some of these altered images were copies of images the court admitted into evidence that had not been altered (exhibits 58, 65, 92; 70, 94, 97). V.G.'s face is superimposed on two exhibits of a developed nude girl (exhibits 72, 88); four exhibits of adult nude or partially nude women (exhibits 75, 80, 83-84); four exhibits of adult women engaged in penetrating themselves with foreign objects (exhibits 73, 78-79, 82); three exhibits of adult women engaged in sex acts with adult males, including intercourse (exhibits 81, 89, 90); and four exhibits of young girls engaged in sex acts with adult males, including intercourse (exhibits 92-95). V.G.'s face is superimposed on three exhibits of adult women engaging in sex acts where defendant's face is also superimposed (exhibits 85-86, 99); five exhibits of young girls engaging in sex acts where defendant's face is superimposed (exhibits 58, 87, 97, 100-101); and one exhibit of a developed girl engaging in a sex act where defendant's face is also superimposed (exhibit 103). V.G.'s face is also superimposed on one exhibit that depicts a girl having sex with a dog (exhibit 98).

B.    *Analysis*

"Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)" (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*).)

To the extent defendant objected based on there being an evidentiary alternative to the volume of pictures the prosecution sought to introduce, his claim on appeal is

15

forfeited. "[W]hen making a section 352 objection grounded upon the existence of an evidentiary alternative, the requirement in [Evidence Code] section 353, subdivision (a), to state specific reasons for an objection necessarily requires the objecting party to identify the evidentiary alternative with specificity. Otherwise, the trial court will not be fully apprised of the basis on which exclusion is sought; nor can the trial court conduct a balancing analysis which involves weighing the probative value of the alternative." (*Holford, supra,* 203 Cal.App.4th at p. 170.) Failing to do so forfeits the argument on appeal. (*Ibid.*)

At trial, defendant did not identify an evidentiary alternative with specificity. Instead, he suggested different numbers of photos be introduced, without specifying how many or which ones. Defense counsel argued 100 photos were too many, and he asked the trial court at one time to limit the number to 50 or 60, and, a few moments later to limit a police officer to introducing anywhere from 1 to 40 photos representing what the officer saw. In his brief before us, defendant specified how many photographs were "not needed," but does not identify which ones. Defense counsel's failure to specify at trial which exhibits should and should not have been admitted precluded the trial court from weighing the probative and prejudicial values of the exhibits defendant would have agreed to admit against all the exhibits whose admission he would have opposed. As a result, he forfeits his argument here to the extent it is based on the existence of an evidentiary alternative.

Defendant also claimed at trial the exhibits should have been excluded under Evidence Code section 352 because, given their nature, they were cumulative and unfairly prejudicial. No doubt, the images were unpleasant for the jury to view, but their probative value outweighed their prejudicial impact. Defendant testified he never viewed or downloaded child pornography on his computers. However, with their superimposed images of V.G. and himself over the original images, and with other copies of those same images appearing unaltered, the exhibits demonstrated defendant had knowingly

16

possessed the images of child pornography, an element of proving possession. (§ 311.11, subd. (a).) Unlike cases involving the admission of gruesome photographs from a murder scene or autopsy, these photographs *were* the crime, not the aftermath of a crime. (*Holford, supra*, 203 Cal.App.4th at pp. 170-171.)

The exhibits were also probative of defendant's molestation crimes. They demonstrated defendant's intent to gratify his prurient desires with children. They also supported L.T. and V.G.'s testimony that defendant in fact committed the lewd acts they testified he had. The prosecutor had chosen these 100 or so images from a collection of some 18,000 found in defendant's home. The pornographic images depicted children and adults in various stages of undress and sexual activity, thereby avoiding being cumulative. They certainly were not more prejudicial than the victims' explicit testimony of defendant's molestations against them. Under these circumstances, we cannot say the number of images admitted was cumulative or unduly prejudicial, or that the trial court acted arbitrarily or capriciously in admitting all of the exhibits.

DISPOSITION

The judgment is affirmed except as to count 7. The judgment on count 7 only is reversed, and the sentence on count 7 is vacated. The trial court is directed to amend the abstract of judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

                                                NICHOLSON     , J.

We concur:

      RAYE             , P. J.

      MURRAY        , J.

17