Filed 8/27/20  P. v. Gustin CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JASON SCOTT GUSTIN,<br><br>    Defendant and Appellant. | B297078<br><br>(Los Angeles County<br>Super. Ct. No. GA099518) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

A jury convicted defendant Jason Scott Gustin of the attempted murder of his girlfriend, Hayley R., and found true that the attempted murder was committed willfully, deliberately, and with premeditation. On appeal, defendant contends (1) the trial court erred by excluding the testimony of defense expert Dr. Gordon Plotkin, who would have testified that defendant had borderline personality disorder and a below-average IQ, and (2) CALCRIM No. 601, which defines premeditation and deliberation, is unconstitutionally vague.

We conclude that the trial court did not abuse its discretion by excluding the testimony of Dr. Plotkin. Most of Dr. Plotkin's testimony was irrelevant to premeditation and deliberation, and because there was overwhelming evidence that defendant planned the attack on Hayley, it is not reasonably likely that the jury would have reached a different result had it been permitted to hear Dr. Plotkin's testimony. We further conclude that the trial court did not err in instructing the jury with CALCRIM No. 601. We therefore affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Prosecution Evidence*

Defendant and Hayley R. began dating in June 2014, when Hayley was 14 years old and defendant was almost 16 years old. They dated for just over two years.

In mid-August 2016, Hayley and defendant agreed to end their relationship. A few days later, defendant texted Hayley that he had changed his mind and wanted to get back together. She told him she had been talking to a boy named Cole and was ready to move on. Defendant became angry and threatened to leak intimate photos of Hayley. He also texted Hayley's mother and said Hayley was cheating on him.

2

On August 17, 2016, Hayley and defendant met for lunch to discuss their relationship. By the end of the lunch, Hayley and defendant had decided to stop dating but to remain friends. Either during or after the lunch, defendant told Hayley he had been cutting himself, and he showed her the knife he had been using.

In the several days that followed, defendant texted Hayley and begged her to get back together with him, telling her how much he loved and needed her. He told her he could not live without her, threatened to kill himself, and sent her a photograph of his arm with superficial cuts on it, telling her he had been hurting himself and would stop if they got back together. In another text, he said he had brain cancer and would get treatment only if she got back with him.

On August 21, 2016, defendant texted Hayley that if she met with him one more time to talk, he would not bother her anymore. She wanted him to stop contacting her, so she agreed to meet him. Defendant said he would pick her up and they would go to a Denny's restaurant near her house.

The next day, August 22, 2016, defendant picked Hayley up at her home at about 11:30 a.m. He seemed sad. He said that he had changed his mind about going to Denny's; he wanted instead to go to a residential area where he and Hayley used to go to eat lunch during the school year. Hayley was texting Cole when she got in the car. Defendant asked who she was texting, and she told him. He said, "Stop talking to him," and grabbed her phone and threw it into the back seat of the car. Defendant seemed upset and angry. They continued in silence for a few minutes.

After defendant parked the car, Hayley confronted him about his threat to leak intimate photos of her. She asked

3

defendant to delete the photos, and he deleted them while she watched. Defendant then asked Hayley why she chose Cole over him. She said Cole was nicer and more respectful of her. Defendant said he would change, but Hayley said she had given him chances before and the relationship was over.

Defendant got angrier and more emotional as the conversation went on, and he asked Hayley, "Why are you acting like this?" He had a look on his face she had never seen before. He raised his voice and sounded mad and upset, which struck her as odd because he had never talked to her that way before.

After 10 or 15 minutes, Hayley told defendant she wanted to go home. She said that if defendant still was upset, he should hit her to get his anger out. Defendant said he would hit her, but he wanted her to close her eyes first. She did so. There was a pause of about 10 seconds, and then Hayley felt something scratch the front of her neck. It felt like a pencil being traced across her neck and it hurt slightly. Hayley opened her eyes, sat up straight, and put her hands to her neck to see if there was blood. As she did so, defendant locked the car doors and then reached over and choked Hayley with both of his hands for 10 to 15 seconds. He had rage in his eyes, and Hayley was terrified he would kill her.

Hayley reached down and pulled the lever on her seat, which caused the seat to recline. She tried to push defendant off of her. Eventually he let go. Hayley begged defendant not to kill her and said she would forget about Cole and would be with defendant again and would not tell anyone what had happened. She thought that if she said those things, defendant might let her get out of the car. Defendant let Hayley go, and she thought he was done. She said she needed some fresh air and wanted to get

4

out of the car. He said mockingly, "Oh, you want to go outside?" Then, he pulled her into his lap and stabbed her in the back of her neck with a knife. He said, "Don't worry. I'll kill myself after I do this." She believed he also said, "If I can't have you, then no one can." He sounded "off, like scared and mad at the same time." Hayley took this to mean that he was going to kill her and then kill himself.

After 10 to 15 seconds, defendant took the knife out of Hayley's neck and sat up. Hayley was able to unlock the car door and open it. As she got out of the car, defendant reached over and cut her leg along her thigh. She later learned she also had a cut on the back of her right bicep, but she did not know how she got it.

Hayley ran across the street to a convalescent hospital and asked for help. Several nurses applied pressure to her wounds and called 911. When the paramedics arrived, they drove her to a hospital, where she was taken directly to the operating room. She received stitches to the front of her throat, eight or nine staples to the back of her neck, and 22 staples to her leg. The injuries to the back of Hayley's neck and to her thigh were the deepest, affecting the skin, fatty tissue, and muscle. The injury to Hayley's right bicep was medium scale, affecting the skin, fatty tissue, and fascia. The cut to the front of her throat was superficial.

An hour or two after defendant attacked Hayley, he was treated by paramedics for a deep knife wound to his wrist. The paramedics retrieved two knives from defendant's pants pockets, which they handed over to law enforcement. The paramedics then transported defendant to a trauma center, where he was

5

treated for a laceration to his left wrist, which punctured the tendon and nerve, and a superficial wound to his neck.

In the months following the attack, Hayley needed physical therapy to regain use of her leg. It was four to six months before she could stand on her leg without it giving out. She has permanent scars on her neck, leg, and arm.

B. *Defense Evidence*

Defendant's cousin, Lisa Calderon, testified that she had known defendant all his life. She had never known him to be aggressive or violent, and she described him as passive, shy, and soft-spoken.

Defendant's older brother, Brian Gustin, testified that defendant was never violent or aggressive. He was timid and introverted, and never got into trouble at school.

Tiffany Sam testified that she worked with defendant's mother in a medical office. Defendant was a "constant fixture" in the office, and had worked there in the summer of 2014 and periodically thereafter. Defendant was always quiet, polite, and friendly.

C. *Procedural History*

The jury found defendant guilty of premeditated attempted murder (Penal Code[1] §§ 664, 187, subd. (a); count 1) and simple mayhem (§ 203; count 2). It further found true that defendant inflicted great bodily injury on Hayley and used a knife in the commission of the offenses.

The court sentenced defendant to a life sentence, plus six years, on count 1, and to the high term of nine years, plus an additional one year, on count 2. Defendant timely appealed.

---

[1]     All subsequent unspecified statutory references are to the Penal Code.

# DISCUSSION

Defendant makes two contentions on appeal. First, defendant contends the trial court prejudicially erred by excluding a defense expert who would have testified that defendant has a low-to-average IQ and suffers from borderline personality disorder. Second, defendant contends the trial court prejudicially erred by instructing the jury pursuant to CALCRIM No. 601, which defendant urges is unconstitutionally vague. As we explain, neither contention has merit.

## I.

### The Trial Court Did Not Abuse Its Discretion by Excluding the Testimony of Defendant's Expert

Defendant contends the trial court erred in excluding the expert testimony of psychiatrist Gordon Plotkin. As we discuss, the court did not abuse its discretion by excluding Dr. Plotkin's testimony, and any error was not prejudicial.

#### A. *Additional Facts*

During trial, the court conducted an Evidence Code section 402 hearing regarding the proffered testimony of defense expert Dr. Plotkin. Dr. Plotkin is a forensic psychiatrist, holds a doctorate in biochemistry, and has worked as a consultant for the Department of Mental Health doing mentally disordered offender evaluations. Dr. Plotkin's opinion was based on his interview of defendant, as well as his review of police reports and defendant's school records.

Dr. Plotkin opined, based on his review of defendant's school records, that defendant had a learning disability and an IQ of 82, which put him just a few points above the cut-off for mild intellectual disability. As a result of defendant's learning disability and low IQ, defendant consistently was about two years

7

behind grade level in math, reading, spelling, and verbal skills. Dr. Plotkin explained that low-IQ individuals have difficulty controlling their impulses because the frontal lobes of their brains are not well developed. This affects executive functioning, the ability to make choices, the ability to control impulses, and the ability to reason abstractly.

Dr. Plotkin also opined, based on his interview with defendant, that defendant suffered from borderline personality disorder. Individuals with borderline personality disorder are "highly impulsive, they're rejection sensitive, they're emotionally labile. They often feel empty. They can depersonalize when stressed. They often have identity diffusion. They can base their identity on who they're with or what group they're with, and they're relatively unstable individuals, difficult to treat." Dr. Plotkin's diagnosis of borderline personality disorder was based, in part, on defendant's "statements . . . directly related to the breakup, the relationship, his feelings about the breakup, his statements about his feelings that he wasn't being supported by family members, that they weren't understanding him, that the victim was abandoning him, which was an especially strong feeling that he was having at that time, which is all consistent with that disorder." The diagnosis was also based on defendant's history of emotional and physical abuse by his father, as well as on defendant's history of cutting himself, which "is almost diagnostic for" borderline personality disorder.

Finally, Dr. Plotkin opined, based on his interview with defendant, that at the time of the incident, defendant was suffering from major depression. That diagnosis was based on defendant's suicide attempt the day of the attack on Hayley, and on his self-reported history of vegetative symptoms, including

8

poor appetite, significant weight loss, sleep difficulties, and feelings of anxiety and hopelessness.

Defense counsel asked if Dr. Plotkin had an opinion whether defendant's low IQ and borderline personality disorder would affect his ability to deliberate and premeditate. Dr. Plotkin said he was "hesitant to use that wording because I avoid that, generally speaking." He opined, however, that defendant's mental condition, history, and presentation "are all consistent with an individual who is very spontaneous, very impulsive, very rejection sensitive, has a very strong feeling of abandonment, [and] at the moment that he's flooded with those emotions can describe a dissociative reaction, which is exactly what he described to me." Dr. Plotkin believed those characteristics "were profoundly significant in [the attack on Hayley], and I think that kind of cluster, that crystallization of all those factors at that time, had a profound effect." Dr. Plotkin further opined that defendant has deficits in his frontal lobe, which affect impulsivity, the ability to inhibit reactions, and the ability to think about behavior.

After hearing argument, the court found that Dr. Plotkin's testimony was not admissible. First, the court said Dr. Plotkin's testimony was not relevant because it would not help the jury determine whether defendant acted willfully, deliberately, and with premeditation, which is "what the defense is offering his testimony for." The court noted that when Dr. Plotkin was asked about defendant's ability to deliberate or premeditate, "he started off by saying 'I wouldn't use those words,' and then he gave an answer that really would not be helpful to the jury one way or the other." Second, Dr. Plotkin's testimony was based entirely on defendant's out-of-court statements and school records, neither of

which were before the jury.  Thus, the jury would have no basis on which to evaluate Dr. Plotkin's opinion.  Third, Dr. Plotkin's testimony was likely to consume undue time and to prejudice the jury.  The trial court therefore exercised its discretion to exclude it under Evidence Code section 352.

B. *The Trial Court Did Not Prejudicially Err by Excluding Dr. Plotkin's Testimony*

Defendant contends the trial court prejudicially erred by excluding Dr. Plotkin's testimony.  For the reasons that follow, we disagree.

Defendant sought to introduce Dr. Plotkin's testimony with regard to the allegation that defendant's attack on Hayley was willful, deliberate, and premeditated within the meaning of Penal Code section 664.  That section provides that an attempted crime shall be punished by imprisonment for one-half the term applicable to the completed crime, except that if the attempted crime "is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole."  (§ 664, subd. (a).)

" 'Willful' means intentional; 'premeditated' means thought over in advance; 'deliberate' means careful weighing of considerations in forming a course of action.  (See CALCRIM No. 521; *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)"  (*People v. Delgado* (2017) 2 Cal.5th 544, 571.)  " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' "  (*People v. Pearson* (2013) 56 Cal.4th 393, 443, quoting *People v. Stitely* (2005) 35 Cal.4th 514, 543.)

10

Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  In appropriate circumstances, evidence of a defendant's "mental disease, mental defect, or mental disorder" is relevant and admissible "on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."  (§ 28.)  Such evidence may be introduced through an expert witness (§ 29), but expert psychiatric testimony is admissible only if it assists the jury— that is, if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact," and "[b]ased on matter (including [the expert's] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  (Evid. Code, § 801.)  Whether a defendant had or did not have the required mental state "shall be decided by the trier of fact."  (§ 29.)

The trial court has broad discretion in deciding whether to admit or exclude expert testimony relevant to a defendant's mental state.  (§ 28, subd. (d); *People v. Jones* (2013) 57 Cal.4th 899, 946.)  The trial court's decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion, and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner.  (*Jones*, at p. 946; *People v. McDowell* (2012) 54 Cal.4th 395, 426.)

11

In the present case, the sole purpose for which defendant sought to introduce Dr. Plotkin's testimony was on the issue of whether defendant's attempted murder of Hayley was deliberate and premeditated. Significantly, however, much of Dr. Plotkin's testimony—namely, that a person with borderline personality disorder was likely to be "very rejection sensitive" and "emotionally labile," "feel empty," have "very strong feeling[s] of abandonment," "have identity diffusion," and have a "dissociative reaction" when faced with rejection—would not have helped the jury determine whether defendant planned to kill Hayley. At best, these issues may have been relevant to explaining why defendant responded so violently to being told that Hayley intended to end their relationship. They were wholly *irrelevant*, however, to whether defendant's attack on Hayley was premeditated.

The only portion of Dr. Plotkin's testimony that arguably was relevant to deliberation and premeditation was his statement that a person with defendant's deficits was likely to be "spontaneous" and "impulsive." However, the trial court excluded Dr. Plotkin's testimony based on Evidence Code section 352. Section 352 permits a court, in its discretion, to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) Trial courts enjoy broad discretion under section 352, and a trial court's exercise of discretion " ' "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]'

12

[Citation.]" (*People v. Snyder* (2016) 1 Cal.App.5th 622, 632–633.)  Here, the trial court was well within its discretion in concluding that the probative value of Dr. Plotkin's testimony, taken as a whole, was substantially outweighed by the likelihood that that testimony would result in an undue consumption of time and would confuse the jury.

In any event, even assuming arguendo that the trial court erroneously excluded Dr. Plotkin's testimony, defendant is unable to demonstrate that its exclusion constituted reversible error.  "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Here, the evidence that defendant planned the attack on Hayley was overwhelming.  The August 22 meeting occurred at defendant's suggestion:  Defendant called Hayley and said that if she would agree to see him one last time, he would not bother her anymore.  When he asked her to meet him, he offered to pick Hayley up and suggested that they go to a Denny's restaurant near her house.  Once Hayley got in the car, however, defendant said he had changed his mind and wanted instead to park in a residential neighborhood, which was unlikely to be heavily populated in the middle of the day.  And, unbeknownst to Hayley, defendant came armed with two knives, which he concealed in his pocket until the moment he attacked her.

Defendant's selection of a remote spot for the encounter strongly suggests that defendant planned the attack.  (See *People v. Elliot* (2005) 37 Cal.4th 453, 471 [" 'the total vulnerability of

the victim and the evidence of a previously selected remote spot for the killing do suggest planning' "].) So too does the fact that defendant brought two knives to the encounter, "which makes it 'reasonable to infer that he considered the possibility of homicide from the outset.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 [fact that the defendant carried the fatal knife into victim's home was evidence of planning]; see also *People v. Elliot*, at p. 471 [that defendant armed himself prior to the attack " 'supports the inference that he planned a violent encounter' "].) Finally, that defendant premeditated the attack on Hayley is strongly suggested by her testimony that defendant reached across her and locked the car door immediately before he began strangling her, presumably to prevent her from escaping. All of this evidence is consistent with a finding that defendant planned to attack Hayley, and fundamentally *inconsistent* with a finding that defendant acted spontaneously after hearing that Hayley would not resume their relationship.

Plainly, even a highly impulsive person may deliberate and premeditate on some occasions. Because all of the evidence at trial pointed to the fact that defendant premediated his attack on Hayley, we conclude it was not reasonably probable that the jury would have returned a different result had it heard Dr. Plotkin's testimony. Accordingly, the trial court did not prejudicially err by excluding that testimony.

## II.

### CALCRIM No. 601 Is Not Unconstitutionally Vague

In the present case, the trial court gave a CALCRIM No. 601 instruction, as follows:

"If you find the defendant guilty of attempted murder under Count ONE, you must then decide whether the People

14

have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation.

"The defendant acted *willfully* if he intended to kill when he acted.  The defendant *deliberated* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  The defendant acted with *premeditation* if he decided to kill before completing the act of attempted murder . . . .

"The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated.  The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.  A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection, not the length of time.

"The People have the burden of proving this allegation beyond a reasonable doubt.  If the People have not met this burden, you must find this allegation has not been proved."

Defendant contends CALCRIM No. 601 is unconstitutionally vague and ambiguous because it "was utterly confusing and contradictory" and creates "uncertainty about what conduct is willful, deliberate, and premeditated."  We review defendant's contention de novo.  (See *People v. Posey* (2004) 32 Cal.4th 193, 218 ["The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law"].)

As defendant concedes, our Supreme Court has used the very language adopted in CALCRIM No. 601 to define premeditation and deliberation.  In *People v. Potts* (2019) 6 Cal.5th 1012, the court said:  " ' " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " '  [Citation.]  ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." '  [Citations.]  'The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' "  (*Id.* at p. 1027; see also *People v. Pearson* (2013) 56 Cal.4th 393, 443–444 ["The very definition of 'premeditation' encompasses the idea that a defendant thought about or considered the act beforehand.  ' " '[P]remeditation' means thought over in advance," ' and ' " '[d]eliberation" refers to careful weighing of considerations in forming a course of action . . . ." '  [Citation.]  'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' "]; *People v. Mayfield* (1997) 14 Cal.4th 668, 767, citing CALJIC No. 8.20 with approval, abrogated on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)

Notwithstanding our Supreme Court's approval of language nearly identical to that used in CALCRIM No. 601, defendant urges we should find the instruction unconstitutionally vague.  Doing so would require us to reject our Supreme Court's precedent, which we are without the power to do.  We therefore

16

decline defendant's invitation to find CALCRIM No. 601 unconstitutionally vague. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)[2]

---

[2] *Johnson v. United States* (2015) 135 S.Ct. 2551, on which defendant relies to suggest that the constitutionality of CALCRIM No. 601 should be reevaluated, is inapposite. *Johnson* concerned the federal Armed Career Criminal Act, 18 United States Code section 924(e)(2)(B), and thus it has no bearing on the issues before us.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

DHANIDINA, J.

18